## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## ASHEVILLE DIVISION
## 1:23-cr-00053-MR-WCM-1

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | MEMORANDUM AND |
| | ) | RECOMMENDATION |
| TORREY LANE HODSDEN, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

This matter is before the Court on Defendant's Motion to Suppress (Doc. 23), which has been referred to the undersigned pursuant to 28 U.S.C. § 636 for the entry of a recommendation.

## I. Relevant Procedural Background

On July 19, 2023, a Bill of Indictment was filed charging Torrey Lane Hodsden ("Defendant") with possession with intent to distribute methamphetamine, fentanyl, and cocaine, in violation of 21 U.S.C. § 841(a)(1); possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A); and being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). Doc. 1.

On August 4, 2023, Defendant made an initial appearance. He requested that counsel be appointed for him, and that request was granted. Also on that day, Defendant was arraigned and entered a plea of not guilty.

1

On December 8, 2023, Defendant filed the Motion to Suppress, by which he moves to suppress any evidence seized from (1) a warrantless search of a Gucci bag, (2) a warrantless search of Defendant's Jaguar, (3) a search of Defendant's residence pursuant to a warrant, and (4) a search of Defendant's phone pursuant to a separate warrant. Docs. 23, 24. The Government responded to the Motion to Suppress, and Defendant replied. Docs. 34, 41.

An evidentiary hearing with respect to the searches of the Gucci bag and Defendant's Jaguar was conducted on April 25, 26, and 29, 2024.[1] The parties presented argument regarding all aspects of the Motion to Suppress on May 10, 2024.

This Memorandum now follows.

## II.    Factual Background

"When material facts that affect the resolution of a motion to suppress… are in conflict, the appropriate way to resolve the conflict is by holding an evidentiary hearing after which the district court will be in a position to make findings." United States v. Taylor, 13 F.3d 786, 789 (4th Cir. 1994). In doing

---

[1] To the extent Defendant seeks the suppression of evidence seized pursuant to warrants authorizing searches of his residence and phone, an evidentiary hearing on those aspects of the Motion was not necessary. See United States v. Wilhelm, 80 F.3d 116, 118 (4th Cir. 1996) ("When reviewing the probable cause supporting a warrant, a reviewing court must consider only the information presented to the magistrate who issued the warrant"); United States v. Griffin, 811 F. App'x 815, 816 (4th Cir. 2020) (per curiam) (stating that "an evidentiary hearing is not always required to resolve a motion to suppress").

so, the court determines "the credibility of the witnesses and the weight to be given the evidence, together with the inferences, deductions and conclusions to be drawn from the evidence." <u>United States v. Gualtero</u>, 62 F. Supp. 3d 479, 482 (E.D. Va. 2014) (citing <u>United States v. McKneely</u>, 6 F.3d 1447, 1452-53 (10th Cir. 1993)).

### A. The Evidence Presented

The Government called the following witnesses: Sergeant Evan Flanders of the Asheville Police Department ("APD"); APD Officer Tyler Sexton; APD Officer Jacob Kielson; APD Detective Steven Escobedo; APD Officer Mark Bengel; North Carolina State Probation Officer Jacob Stamey; North Carolina State Probation Officer Charity Anderson; and APD Detective and Drug Enforcement Administration Task Force Officer ("TFO") Sonia Escobedo.

The Government also presented 77 exhibits, which included footage from the body worn cameras of various officers as well as written documents.

Defendant did not call any witnesses but did submit additional exhibits.

### B. Factual Findings

Based on the information of record and as presented during the hearing, the undersigned finds the relevant facts to be as follows:

### 1. Events Prior to March 7, 2023

In March 2023, Sergeant Flanders was assigned to the APD's "Impact Team," a unit primarily focused on short term investigations involving gun violence and drug offenses (the "Team").

On March 1, 2023, Sergeant Flanders observed a dark gray Jaguar with South Carolina license plate WBT864 (the "Jaguar") driving in the Klondyke public housing development in Asheville, North Carolina. Sergeant Flanders testified that he considered this area to be an "open air" drug market, which he explained was any area in which multiple dealers were selling drugs.

On March 2, 2023, Officer Anderson circulated a profile picture from Defendant's Facebook page on a group text chain that involved numerous police officers (the "Text Chain"). The profile picture showed Defendant holding what appeared to be cash, in multiple banded bundles, next to his ear. Government's Exhibit 3. Officer Anderson stated in the Text Chain that the person shown in the profile picture was the person Sergeant Flanders had previously observed in the Klondyke area.[2] Officer Anderson testified that she had also observed the Jaguar in the Klondyke neighborhood and had noticed the South Carolina license plate. Another officer on the Text Chain sent a screenshot of Defendant's profile from a "Police to Police" ("P2P") database,

---

[2] Officer Anderson used a dummy account to friend Defendant on social media.

which included a 2019 booking photo of Defendant and listed Defendant's address as 6 Rocking Porch Road, Asheville, North Carolina ("Rocking Porch Road"). The P2P profile also included Defendant's previous arrests in Buncombe County. Government's Exhibit 11.

On Monday, March 6, 2023, an employee of the Spruce Hill Apartments in Asheville, North Carolina ("Spruce Hill") contacted Sergeant Flanders by text message.[3] Sergeant Flanders testified that he considered the employee (the "Tipster") to be a "very credible" source; the person had provided tips in the past, had never been compensated for the tips, and had not been the subject of criminal charges. The Tipster advised that he/she had received multiple complaints about an individual selling drugs out of a gray Jaguar with South Carolina license plate WBT864. <u>See</u> Government's Exhibit 1. The Tipster additionally stated that he/she had seen the Jaguar in four different parking spots the previous Friday and that the driver did not live in the Spruce Hill Apartments but had visited Eli Quick, a resident of the Apartments, frequently.

That same day, Sergeant Flanders viewed the registration for the Jaguar, which indicated that the vehicle was registered to Defendant and listed a South Carolina address for him. Sergeant Flanders reached out to

---

[3] Spruce Hill is also a public housing project.

5

South Carolina authorities, who confirmed that Defendant was on federal probation and was supposed to be in South Carolina. Government's Exhibit 12A.

Officer Anderson provided officers on the Text Chain with another photo that had been posted to social media that showed Defendant posing in front of a mirror wearing swim trunks. Government's Exhibit 8 (the "Swim Trunks Photo"). Sergeant Flanders observed what he believed to be a firearm in the pocket of Defendant's swim trunks in that photo.

### 2. March 7, 2023

#### a. Events Prior to Surveillance at Rocking Porch Road

On March 7, 2023, Sergeant Flanders sent the Tipster the Swim Trunks Photo as well as the screenshot from the P2P database, with the note "I think it's this guy but he's cut his dreds off." Government's Exhibits 9, 10. The Tipster responded "Yup!! That's 121D Eli Quick brother. He has quite an arrest history I see. That's him alright!!!" Government's Exhibit 10.

At approximately 11:00AM, the Team had a morning meeting and Sergeant Flanders advised that Defendant was the target of the Team's investigation. He also circulated information that included the Swim Trunks Photo and the P2P screenshot, a description of the Jaguar, and possible

addresses associated with Defendant. Government's Exhibit 5.[4] Information was also disseminated on the Text Chain indicating that Defendant's North Carolina driver's license had been suspended, but that information regarding the status of Defendant's South Carolina license had not been obtained. See also Government's Exhibit 19 (showing Defendant's North Carolina license was suspended).

At approximately 12:48PM, TFO Escobedo obtained Defendant's criminal history, which showed Defendant had previously pled guilty to federal gun and drug charges and was on federal supervised release. See Government's Exhibit 14.

### b. Surveillance of Rocking Porch Road & Issuance of the Arrest Warrant

In an attempt to locate and surveil Defendant, Sergeant Flanders went to Rocking Porch Road, TFO Escobedo went to the Spruce Hill apartments, and other officers went to other areas, including Klondyke. Sergeant Flanders testified that the Team's intention was to find Defendant and the Jaguar, and, if Defendant was driving the Jaguar, conduct a traffic stop to see if Defendant was in possession of guns or drugs.

---

[4] Rocking Porch Road was included in the list of associated addresses because Defendant and his girlfriend, Cierra Candler, lived there and officers had responded to a previous incident during which Candler had discharged a firearm.

7

While surveilling Rocking Porch Road, Sergeant Flanders observed the parked Jaguar, and saw Defendant leave the residence, walk to the Jaguar and remove a plastic grocery bag, and return to the residence. A short time later, Defendant and Candler exited the residence and left in the Jaguar. Defendant was driving; Candler was in the passenger seat. See Government's Exhibits 13, 17, 18.

TFO Escobedo observed the Jaguar pass her in the Spruce Hill apartments and could see that Defendant was driving. TFO Escobedo followed the Jaguar through a residential neighborhood and observed the Jaguar run a couple of stop signs and speed. She followed the vehicle as it got onto Interstate 240 westbound and observed the Jaguar cut in and out of traffic.[5] TFO Escobedo testified that the Jaguar was moving too fast for her to keep up with it, so she radioed other officers to let them know the Jaguar's location.

Detective Escobedo and Officer Bengel, in separate vehicles, began following the Jaguar, which exited Interstate 240 toward Merrimon Avenue in Asheville. Detective Escobedo activated his blue lights and attempted a traffic stop.[6] The Jaguar slowed down for a moment but failed to stop, continued

---

[5] Officer Anderson was also assisting with surveillance in the area. She observed the Jaguar driving over the speed limit, and followed the Jaguar onto Interstate 240, where she observed Defendant driving.

[6] Detective Escobedo testified that, although he did have a working body worn camera that day, he failed to label the video correctly, and the footage was subsequently deleted.

through two stop signs, turned right on Broadway, and then proceeded toward the Montford area of Asheville. Detective Escobedo did not pursue the Jaguar due to the time of day and the possibility of pedestrian traffic.

When officers in the vicinity were not able to locate the Jaguar, Sergeant Flanders requested that Detective Escobedo obtain a warrant for Defendant's arrest and that the other members of the Team split up and try to locate the Jaguar. Sergeant Flanders testified that he also researched Candler to find other addresses associated with her, and identified 1 Eastcrest Drive, in the Fairview community of Buncombe County ("Eastcrest Drive"). Both Sergeant Flanders and TFO Escobedo, who were in separate unmarked vehicles, headed toward Eastcrest Drive. Sergeant Flanders also reached out to the Buncombe County Sheriff's Office since the APD officers were entering the County's jurisdiction. Government's Exhibit 23C.

At approximately 3:12PM, TFO Escobedo drove past Eastcrest Drive, and observed Defendant backing the Jaguar into the driveway in front of a white Jeep (the "Jeep"). TFO Escobedo radioed the rest of the Team to inform them that she had located the Jaguar and began conducting surveillance.

An arrest warrant was issued by a Buncombe County magistrate at approximately 3:26PM for Defendant for felony fleeing to elude arrest, misdemeanor reckless driving and "DWLR" (driving while license revoked). Government's Exhibits 22, 22A.

9

### c. The Stop of the Jeep

TFO Escobedo observed Defendant move the Jaguar to allow the Jeep to leave the driveway. Defendant then backed the Jaguar into the spot previously occupied by the Jeep and got into the backseat of the Jeep, which drove away toward Asheville. TFO Escobedo initially followed the Jeep, but ultimately returned to Eastcrest Drive to monitor the Jaguar.[7]

Sergeant Flanders, who by that point had parked near Eastcrest Drive, followed the Jeep back toward Asheville and Officer Bengel conducted a traffic stop of the Jeep after it entered the city limits. Officer Kielson and Officer Sexton, who were both in Officer Kielson's patrol vehicle, parked behind Officer Bengel's vehicle; Detective Escobedo, in a third patrol vehicle, parked beside Officer Bengel's vehicle.

Officer Bengel approached the Jeep on the driver's side and advised the driver of the Jeep, who was later identified as Amanda Patterson, to put her hands on the dash. He then asked Mrs. Patterson to exit the Jeep, patted her down, and placed her in handcuffs.

At approximately the same time, Officer Kielson and Officer Sexton approached the passenger side of the Jeep. Officer Sexton opened the rear

---

[7] While there, TFO Escobedo reached out to the federal probation office in South Carolina and also spoke with the probation office in this district. TFO Escobedo testified that she was unsuccessful in getting a federal probation officer to meet the officers at Eastcrest Drive.

passenger door and removed Defendant. Officer Kielson assisted. Detective Escobedo was positioned behind Officers Kielson and Sexton.

When Defendant got out of the Jeep, he leaned over a nearby guardrail. Although the officers told him that he could stand up, Defendant remained in that position until he was handcuffed. When Defendant stood up, Detective Escobedo stated "82" and Officer Sexton stated "82 in his pocket." These statements indicated that Detective Escobedo and Officer Sexton had observed a firearm on Defendant's person. Government's Exhibit 27.

As Defendant was being handcuffed, Officer Kielson moved to the area outside the front passenger door of the Jeep and handcuffed Candler, who had already exited the Jeep. As he was doing so, Officer Kielson stated, "Hey, there's a gun in the center console." Candler responded, "It's my gun." Officer Kielson testified that he observed the gun while he was standing outside of the Jeep, and stated to other officers that the gun was in plain view in the center console and that it was "readily apparent that it was a gun."

Officer Bengel placed Mrs. Patterson, who was still in handcuffs, in the back of his patrol vehicle.

Officer Sexton and Detective Escobedo conducted a pat down of Defendant, during which Officer Sexton removed a gun from Defendant's right

jacket pocket.[8] He also removed a bundled amount of cash with a gray cell phone (the "Gray Phone") in the middle and a Visa card from Defendant's pants pocket. Defendant was placed in the backseat of Detective Escobedo's patrol vehicle.

Candler was placed in the backseat of Officer Kielson's patrol vehicle.

Officer Bengel, Detective Escobedo, and Officer Sexton then searched the Jeep. Detective Escobedo searched a red purse that was in the front passenger seat and found a "large amount of money" and "edibles." <u>See</u> Government's Exhibit 25. The red purse was given to Officer Kielson, who placed it with other seized property.[9]

While searching the backseat of the Jeep, Officer Sexton discovered a brown and red Gucci bag (the "Bag"). Inside was a phone, a bag containing a green leafy substance, a bag containing white powder, and two transparent plastic grocery bags containing what Officer Sexton described as a "bunch of cash." Government's Exhibit 27. Denominations of 50- and 100-dollar bills were visible.

After the search of the Jeep was completed, Mrs. Patterson was removed from Officer Bengel's patrol vehicle and Mrs. Patterson, Detective Escobedo,

---

[8] Both the gun found in the center console (which Candler claimed) and the gun found on Defendant's person were loaded. Neither firearm was reported to be stolen.

[9] Officer Kielson later looked in the red purse and located a key to the Jaguar.

and Officer Bengel began to talk. Detective Escobedo advised Mrs. Paterson of her rights under <u>Miranda v. State of Arizona</u>, 384 U.S. 436 (1966) and Mrs. Patterson stated that she understood and was willing to speak with Detective Escobedo.

Detective Escobedo explained that Defendant and Candler had fled from him earlier in the day and that a warrant for Defendant's arrest had been issued. He stated that officers had stopped the Jeep because they knew Defendant was in the backseat, and that upon Defendant's arrest, officers found a firearm on Defendant's person. Detective Escobedo also told Mrs. Patterson that Defendant was a convicted felon out of South Carolina who was on probation, and that the officers had found a large amount of money and narcotics in the Jeep near the area where Defendant had been sitting. Detective Escobedo further advised Mrs. Patterson that a second gun had been found in the center console of the Jeep. Mrs. Patterson stated that she knew Defendant was Candler's boyfriend but that she did not "know him personally" and had "met him once." She explained that she "worked for the county" and had been on her lunch break when Defendant and Candler arrived at her home and asked her for a ride back to Asheville because the Jaguar was having mechanical problems. Since she was headed back to work to attend a 5:00PM meeting of the county commissioners, she agreed to give Defendant and Candler a ride to their house. Detective Escobedo advised Mrs. Patterson that

he would call his supervisor (Sergeant Flanders) and find out if she was free to go.[10] While he was doing so, Officer Bengel spoke with Mrs. Patterson, and Mrs. Patterson told him that Candler had never brought Defendant to her home. A short time later, Officer Bengel removed Mrs. Patterson's handcuffs, and Detective Escobedo began to speak with her again. Government's Exhibit 26.

Detective Escobedo asked Mrs. Patterson if she was willing to go back to Eastcrest Drive with officers so they could tow the Jaguar. In response, Mrs. Patterson stated, "I don't have the keys, but yeah." Detective Escobedo then asked twice more if she was willing to go back to Eastcrest Drive to allow officers to tow the Jaguar. Mrs. Patterson stated, "I don't understand, why do you need me to do that?" and Officer Bengel explained, "Since it's your property, we have to have your permission to come up and grab it [the Jaguar]." In response, Mrs. Patterson stated, "Yeah, I can let my husband know you're coming. My husband's home…he can give you that authority." Detective Escobedo then gave his phone to Mrs. Patterson, and Mrs. Patterson spoke with Sergeant Flanders, who also advised her that officers needed to go onto her property to tow the Jaguar. Mrs. Patterson again stated that her husband,

---

[10] Although Sergeant Flanders was initially present at the scene of the Jeep stop, he, along with Officers Stamey and Anderson, returned to Eastcrest Drive before the stop was completed.

a military veteran, was home and would "absolutely" talk to the officers. <u>See</u> Government's Exhibit 26.[11] After some additional conversation with Sergeant Flanders, Mrs. Patterson handed the phone back to Detective Escobedo, and stated that Sergeant Flanders had asked her to speak with Candler.

Officer Bengel told Mrs. Patterson that officers had located the keys to the Jaguar,[12] and that Defendant and Candler would be interviewed by the police. Mrs. Patterson stated that she needed Candler's key because there were puppies in the residence, and that she was worried about the dogs. Mrs. Patterson and Detective Escobedo walked to Officer Kielson's vehicle. Mrs. Patterson asked Candler for the keys to Rocking Porch Road and Detective Escobedo asked Candler if she would consent to a search of Rocking Porch Road. Candler refused both requests. <u>See</u> Government's Exhibit 25.

At the conclusion of the stop, Officer Bengel and Mrs. Patterson exchanged contact information and Mrs. Patterson left the scene in the Jeep. Defendant and Candler were transported to the Buncombe County Detention Facility. Officer Bengel proceeded to Eastcrest Drive to deliver the keys to the Jaguar to Sergeant Flanders.

---

[11] Sergeant Flanders' side of this conversation was not recorded by body worn camera.

[12] As noted, the keys to the Jaguar were eventually found in the red purse by Officer Kielson.

### d. The Search of the Jaguar

When Sergeant Flanders returned to Eactcrest Drive (while the traffic stop of the Jeep was being conducted), two vehicles were backed into the driveway in front of the home – a beige Tahoe (the "Tahoe") and the Jaguar. Although the property was fenced, the gate was open. Sergeant Flanders and Officer Anderson entered, and Officer Anderson stood near the passenger side of the Jaguar while Sergeant Flanders walked up onto the front porch. Officer Stamey then entered the property and stayed near the Jaguar.

Sergeant Flanders knocked on the front door and Mr. Patterson answered. Mr. Patterson was holding a cellphone and stated that he was talking with his wife. Sergeant Flanders then asked if Mrs. Patterson had "explained everything" to him, and Mr. Patterson stated that she had. Sergeant Flanders told Mr. Patterson that "we just need to take the car," to which Mr. Patterson replied, "that's fine." Sergeant Flanders and Mr. Patterson discussed Mr. Patterson's military service. Sergeant Flanders advised him that they had "a tow truck on the way," and that officers would just "hang out" in the driveway until the tow truck and the key to the Jaguar arrived. Mr. Patterson said that was fine and continued talking with Sergeant Flanders and Officer Anderson. Defendant's Exhibit 12. During the hearing, Officer Anderson, Officer Stamey, and Sergeant Flanders each characterized Mr. Patterson as friendly, relaxed, and cooperative.

16

At one point, Sergeant Flanders stepped away from the front porch (where Mr. Patterson was standing) and walked toward Officers Anderson and Stamey, who both advised that they smelled the odor of marijuana coming from the Jaguar. Sergeant Flanders leaned toward the driver's door and also smelled marijuana. Defense Exhibit 12. Officer Stamey additionally stated that he could see what he believed to be the corner of a vacuum sealed plastic bag in the Jaguar. Shortly thereafter, TFO Escobedo arrived and joined Sergeant Flanders and Officers Anderson and Stamey at the Jaguar.

Sergeant Flanders then contacted the District Attorney's Office to discuss searching the Jaguar. An Assistant District Attorney ("ADA") recommended obtaining a search warrant, but also advised that if the Jaguar had been involved in the offense of fleeing to elude arrest, the vehicle could be seized and inventoried. Additionally, the ADA stated that there was probable cause to search the Jaguar based on the odor of marijuana, the observation of the vacuum sealed bag, the items found on Defendant's person during the search of the Jeep, the Tipster's information, and Defendant's criminal history and probation status.

Officer Bengel arrived with the keys to the Jaguar, and at approximately 4:40PM, the officers began searching the Jaguar. Officer Bengel returned to his patrol vehicle and obtained a phone, which he used to take pictures during

17

the search. TFO Escobedo also took pictures using a separate phone. See Defense Exhibit 32.

Sergeant Flanders documented evidence by placing items in bags and completed a Property and Evidence Voucher that listed evidence removed from the Jaguar, Government's Exhibit 42, but he did not complete an inventory sheet or ask any other officer at the scene to do so. Further, only contraband was removed from the Jaguar. Certain items of value, including a curling iron and makeup kit, were left on the dash of the Jaguar and a bag containing a laptop was left in the trunk.

While officers were searching the Jaguar, Mr. Patterson left Eastcrest Drive in the Tahoe to pick up the Pattersons' younger child.

The Jaguar was subsequently towed and stored in a secure warehouse, and items that were left in the Jaguar (including the curling iron and laptop) were eventually returned to Candler. The Jaguar itself was also released to Candler.

### e.  The Search of Rocking Porch Road

Sergeant Flanders obtained a search warrant for Rocking Porch Road at 7:26PM. The warrant was executed at 7:55PM. Government's Exhibit 47. The search resulted in the seizure of, among other things, cocaine, methamphetamine, fentanyl, crack cocaine, and $7,210.00 in cash.

### 3. Events After March 7, 2023

On March 23, 2023, Sergeant Flanders obtained a search warrant for the Gray Phone, which had been seized from Defendant during the traffic stop of the Jeep. Government's Exhibit 48, the "Cell Phone Warrant."

Between March 7, 2023 and March 23, 2023, Defendant was detained in the Buncombe County Jail.

## III.  Analysis

Defendant does not challenge Detective Escobedo's attempted traffic stop of the Jaguar or the subsequent arrest warrant that was issued for Defendant. Rather, Defendant argues that the search of the Bag, the Jaguar, Rocking Porch Road, and the Gray Phone were unconstitutional.

### A. The Warrantless Searches

"As a general rule, the Fourth Amendment requires that law enforcement searches be accompanied by a warrant based on probable cause." United States v. Kolsuz, 890 F.3d 133, 137 (4th Cir. 2018). Warrantless searches and seizures i.e., those "conducted outside the judicial process," without prior approval by a judge or a magistrate, are *per se* unreasonable, subject only to a few well-established exceptions. Katz v. United States, 389 U.S. 347, 357 (1967); see also Kentucky v. King, 563 U.S. 452, 459-60 (2011); Minnesota v. Dickerson, 508 U.S. 366, 374 (1993).

19

## 1. The Search of the Bag

The Government asserts that the search of the Bag can be justified as a search incident to arrest or under the automobile exception. Defendant disagrees.

### a. Search Incident to Arrest

"Police may search a vehicle incident to a recent occupant's arrest only if the arrestee is within reaching distance of the passenger compartment at the time of the search or it is reasonable to believe the vehicle contains evidence of the offense of arrest." Arizona v. Gant, 556 U.S. 332, 351 (2009); see also Davis v. United States, 564 U.S. 229, 232 (2011) (A search of an automobile incident to an arrest "is constitutional (1) if the arrestee is within reaching distance of the vehicle during the search, or (2) if the police have reason to believe that the vehicle contains 'evidence relevant to the crime of arrest.'") (quoting Gant, 556 U.S. at 343 (2009)).

Here, the Government contends that the second Gant exception – a reasonable belief that the Bag contained evidence of the offense of arrest – applies.[13]

The warrant for Defendant's arrest was issued for the offenses of (1) felony fleeing to elude arrest with a motor vehicle, (2) misdemeanor reckless

---

[13] The Government clarified during oral argument that it was not arguing the first Gant exception applied.

driving – wanton disregard, and (3) misdemeanor DWLR. Government's Exhibit 22. The Government has not explained sufficiently why it was reasonable to believe that evidence of these offenses would be found in the Bag. See United States v. Badger, 445 Fed. Appx. 648 (4th Cir. 2011) (unpubl.) (search of vehicle conducted after defendant was detained was unlawful under Gant because "it was not reasonable to believe that evidence of Badger's reckless driving—the offense for which he was arrested—would be found in the truck."); United States v. Teasley, No. 3:22-cr-00083-FDW-DCK, 2023 WL 2599019, at *10 (W.D.N.C. March 22, 2023) ("Officer Smith could not have found contraband related to the traffic violation at issue here, because in such cases, 'there will be no reasonable basis to believe the vehicle contains relevant evidence' for such offenses.") (quoting Gant, 556 U.S. at 343)).

The Government points out, though, that when Defendant was searched while being arrested for those offenses, a gun was found on his person. The discovery of that gun, the Government argues, gave the officers a reasonable belief that additional evidence of "guns, ammunition, or gun paraphernalia" would be found in the Bag. That is, the Government argues that the discovery of the firearm while Defendant was being searched incident to his arrest for the traffic offenses made it reasonable for the officers to believe that other evidence related to the firearm offense would be found in the Bag.

In response, Defendant asserts that once the firearm was found on his person, there was nothing left to find through a search of the Bag. In other words, Defendant contends that upon the officers' discovery of the gun in Defendant's pocket, the firearm offense was complete, and there was no need to search the Bag for additional evidence of that crime. See also Doc. 41 at 12 ("When they stopped the Jeep, officers had reason to believe that Mr. Hodsden and Ms. Candler each possessed a single firearm…. They found both of those firearms before they searched the Jeep, and they had no information suggesting that either Mr. Hodsden or Mr. Candler had any other firearms.").

Prior to searching the Jeep, the officers knew that Defendant had been previously convicted of a felony and was under federal supervision, and they had located a gun in his pocket. Consequently, it reasonable for them to believe that the Bag could contain additional evidence concerning the firearm offense. See U.S. v. Leak, No. 3:09–cr–81–W, 2010 WL 1418227, at *5 (W.D.N.C. April 5, 2010) ("this Court concludes, because Defendant was arrested for carrying a concealed weapon, the officers reasonably believed that the vehicle contained evidence concerning the gun and a search of the vehicle was proper."); United States v. Rochelle, 422 Fed. Appx. 275, 277 (4th Cir. April 11, 2011) (unpubl.) (per curiam) (finding that officers had reason to believe the defendant's vehicle

contained evidence of the offense of arrest, which was unlawful firearms possession), cert. denied, 565 U.S. 958 (2011).[14]

### b. The Automobile Exception

The Government also contends that there was probable cause to search the Bag under the automobile exception.

Pursuant to that exception, "officers may search a vehicle without a warrant if the vehicle 'is readily mobile and probable cause exists to believe it contains contraband or evidence of criminal activity.'" United States v. Graham, 686 Fed. App'x 166, 173 (4th Cir. 2017) (quoting United States v. Baker, 719 F.3d 313, 319 (4th Cir. 2013)); see also United States v. Baker, 719 F.3d 313, 319 (4th Cir. 2013) (noting that, "in contrast to Gant's rule, [the automobile] exception permits police officers to search a vehicle for evidence of any crime, not just the crime of arrest, but only on a showing of probable cause rather than a mere reasonable belief").

---

[14] Defendant also argues the discovery of Candler's gun in the Jeep and Defendant's gun on his person did not make it reasonable for the officers to believe there were additional firearms in the Jeep. In support, Defendant relies on United States v. Black, 707 F.3d 531, 540-541 (4th Cir. 2013), in which the court rejected officers' reliance on the so-called "Rule of Two," an assumption that because one individual lawfully possessed a firearm, someone else in his group must also be in possession of a firearm. Here, however, the search of the Jeep, and therefore the Bag, was based on the firearm that was discovered in Defendant's pocket while he was being searched incident to his arrest for the traffic offenses, and not solely on the discovery of Candler's legally possessed firearm.

To support this position, the Government argues that, at the time of Defendant's arrest, the Team was investigating a lead from the Tipster regarding Defendant and the Jaguar, knew that Defendant had previously fled from police in the Jaguar, and had seen Defendant park the Jaguar at Eastcrest Drive and return to Asheville in the Jeep. The Government also notes that, upon Defendant's arrest, a gun and a large amount of cash was found on his person.

The undersigned assigns little weight to the information provided by the Tipster. Although the Tipster did reference the license plate number of the Jaguar, the Tipster also only reported secondhand information about the driver engaging in drug related activity in the Spruce Hill Apartments. See United States v. Drakeford, 992 F.3d 255, 264 (4th Cir. 2021) ("the only information that proved useful to detectives in connecting the informant's tips to Appellant was the vehicle tag number that was connected to him. But that alone does not connect him to drug trafficking. It connects him to a vehicle and that is it."); United States v. Peters, 60 F.4th 855, 866-867 (4th Cir. 2023) (explaining that, because tips vary in reliability, the court must take into account the totality of the circumstances supporting a stop, and that it was of "crucial importance" that the officer failed to take any steps to corroborate the confidential informant's information). Further, Sergeant Flanders did not attempt to corroborate the Tipster's information independently but instead

provided a suggestive photo of Defendant (a booking photo with Defendant's criminal history) accompanied by a note stating "I think it's this guy...." Government's Exhibits 9, 10.

Next, Defendant's failure to stop the Jaguar when Detective Escobedo activated his blue lights, without more, would not provide probable cause to search the Bag. See United States v. Davis, 997 F.3d 191, 201 (4th Cir. 2021) ("While Davis's flight coupled with the cash in his pockets may have given the officers an articulable suspicion that evidence of a crime could be located in the vehicle, it did not give them probable cause to circumvent the Fourth Amendment's warrant requirement and search the vehicle.").

In addition to Defendant's flight, however, officers discovered a firearm in Defendant's pocket and the Fourth Circuit has stated that, when "a police officer lawfully searches a vehicle's recent occupant and finds contraband on his person," probable cause to search the vehicle exists. U.S. v. Baker, 719 F.3d 313, 319 (4th Cir. 2013) (citing United States v. Johnson, 383 F.3d 538, 545 (7th Cir. 2004) (an officer's "discovery of a banned substance (drugs) on [the defendant's] person clearly provided [the police officer] with probable cause to search the trunk of the vehicle"); United States v. Sellers, No. 3:21-00120, 2021 WL 4928012, at *5 (S.D. W.Va. Oct. 21, 2021) ("SA McNees recognized Defendant and knew him to be a felon, meaning he was prohibited from possessing a firearm. His admission to having the gun provided the requisite

probable cause to believe that contraband was in the vehicle, authorizing the search.").

Accordingly, the totality of the circumstances provided sufficient probable cause for law enforcement to search the Bag pursuant to the automobile exception. See United States v. Ross, 456 U.S. 798, 825 (1982) ("If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search."); Wyoming v. Houghton, 526 U.S. 295, 307 (1999) ("We hold that police officers with probable cause to search a car may inspect passengers' belongings found in the car that are capable of concealing the object of the search.").

### 2. The Search of the Jaguar

#### a. Defendant's Expectation of Privacy in Eastcrest Drive

The parties agree that the Jaguar was parked in the curtilage of Eastcrest Drive when it was searched by the officers. They disagree, though, on whether Defendant had a sufficient expectation of privacy in that area to give him standing to object to the officers' entry onto the property.

Defendant asserts that, prior to March 7, 2023, he had parked the Jaguar in the driveway of Eastcrest Drive "numerous times," had celebrated birthdays and holidays at the Pattersons' home and had "an especially close relationship with Mrs. Patterson." Defendant's Exhibit 2.

26

In her affidavit, Mrs. Patterson states that Defendant "had frequently visited" her home as a social guest and that she had a close relationship with Defendant. Defendant's Exhibit 28. However, the Government points out that during the stop of the Jeep, Mrs. Patterson stated that she did not "know [Defendant] personally" had "met him once," and that Candler had never brought Defendant to Eastcrest Drive.

Neither Defendant nor Mrs. Patterson testified during the suppression hearing, so the statements set out in their affidavits were not tested through cross examination. However, for purposes of the Motion to Suppress, the undersigned will assume that Defendant had an expectation of privacy in the curtilage of Eastcrest Drive sufficient to challenge the officers' entry onto the property.

### b.  Consent to Access the Property

Defendant contends that neither Mrs. nor Mr. Patterson gave their consent for the officers to enter the curtilage of Eastcrest Drive, and therefore the search of the Jaguar could not be authorized pursuant to either the automobile or inventory exceptions. See e.g., G.M. Leasing Corp. v. United States, 429 U.S. 338, 354 (1977) ("It is one thing to seize without a warrant property resting in an open area ..., and it is quite another thing to effect a warrantless seizure of property ... situated on private premises to which access is not otherwise available for the seizing officer"). Specifically, Defendant

27

contends that Mrs. Patterson was worried about getting to her job on time and accessing the puppies at Rocking Porch Road, such that she was distressed and pressured when she told officers they could tow the Jaguar, and that Mr. Patterson, as a black male, was reluctant to do anything other than agree with the officers.

"A well recognized exception to the warrant requirement occurs when an officer first secures the voluntary consent to enter 'from the individual whose property is searched ... or from a third party who possesses common authority over the premises[.]'" U.S. v. Powell, 929 F.Supp. 231, 234 (S.D. W.Va. 1996) (quoting Illinois v. Rodriguez, 497 U.S. 177, 181 (1990)). The question of whether consent is voluntary, rather than "the product of duress or coercion, express or implied — is one 'of fact to be determined from the totality of all the circumstances.'" United States v. Azua-Rinconada, 914 F.3d 319, 324 (4th Cir. 2019) (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 233 (1973)). The factors to be reviewed include the characteristics of the individual (such as age, maturity, education, intelligence, and experience) and whether the individual knew he or she possessed a right to refuse, "as well as the conditions under which the consent to search was given (such as the officer's conduct; the number of officers present; and the duration, location, and time of the encounter)." See United States v. Lattimore, 87 F.3d 647, 650 (4th Cir. 1996).

The Government has the burden of establishing, by a preponderance of the evidence, that valid consent was provided. United States v. Buckner, 473 F.3d 551, 554 (4th Cir. 2007). "[S]howing no more than acquiescence to a claim of lawful authority" does not satisfy the Government's burden. Bumper v. North Carolina, 391 U.S. 543, 549 (1968).

With respect to Mrs. Patterson, the testimony during the hearing and footage from the officers' body worn cameras confirms that she was visibly upset during the traffic stop of the Jeep. Further, at the onset of that encounter, she was patted down, handcuffed, and placed in the back of a patrol vehicle. Additionally, multiple marked police vehicles, as well as multiple APD officers, were present at the stop.

However, it appears that one of her primary concerns was getting back to her job; she identified herself as an employee of the county, and informed the officers that she was, at the time of the stop, headed back to work to attend a county commissioners' meeting. She also expressed concern about caring for the puppies at Rocking Porch Road. She was read Miranda warnings and stated that she understood her rights. Finally, though she was handcuffed initially, she was not handcuffed at the time Detective Escobedo asked her repeatedly if she was willing to go back to Eastcrest Drive with officers so they could tow the Jaguar. In response to those inquiries, Mrs. Patterson stated, "I

don't have the keys, but yeah" and later advised, "Yeah, I can let my husband know you're coming. My husband's home…he can give you that authority."

With respect to Mr. Patterson, the officers did not explicitly ask him for consent to enter the property but rather told him they would be towing the Jaguar. This information cuts against a finding that Mr. Patterson provided consent to enter the property.

On the other hand, at the beginning of his interaction with Sergeant Flanders, Mr. Patterson stated that he was on the phone with Mrs. Patterson and indicated that he understood the situation. When Sergeant Flanders advised Mr. Patterson that the officers needed to take the Jaguar, Mr. Patterson replied, "that's fine."  Further, the testimony, as confirmed by the footage from Sergeant Flanders' body worn camera, shows that Mr. Patterson was conversational and calm when he spoke with the officers; he identified himself as a military veteran, discussed his previous deployment, and even stated that he had a "top secret security clearance." Finally, while the officers were searching the Jaguar, Mr. Patterson left Eastcrest Drive to pick up the Pattersons' younger child.

Based on the totality of the circumstances, the Government has made a sufficient showing that both Mrs. Patterson and Mr. Patterson gave officers their consent to enter the curtilage of Eastcrest Drive. See e.g., United States v. Smith, 2023 WL 25349 (E.D. Va. Jan. 3, 2023) (finding valid consent to

search where both officers' and defendant remained cordial and conversational, defendant was told he was being released prior to officer asking for consent, there was no show of force, and defendant handed the bag to be searched over to the officers).

### c. The Automobile Exception

A separate question exists, however, as to whether the officers were legally authorized to search the Jaguar without first obtaining a warrant. Again, the Government asserts that the automobile exception applies.

Here, both Officer Anderson and Officer Stamey testified that while standing beside the Jaguar while it was parked in the driveway of Eastcrest Drive, they smelled the odor of marijuana coming from the vehicle. Sergeant Flanders' body worn camera footage shows that both officers advised him of the odor, following which he leaned toward the closed driver's door and stated, "oh yeah."

The Fourth Circuit has held that "the odor of marijuana alone can provide probable cause to believe that marijuana is present in a particular place.... While smelling marijuana does not assure that marijuana is still present, the odor certainly provides probable cause to believe that it is." United States v. Humphries, 372 F.3d 653, 658 (4th Cir. 2004) (citing United States v. Scheetz, 293 F.3d 175, 184 (4th Cir. 2002) (holding that the smell of marijuana emanating from a properly stopped automobile constituted probable cause to

believe that marijuana was in the vehicle, justifying its search)); see also United States v. Champion, 609 Fed. Appx. 122, 125 (4th Cir. 2015) (finding the strong odor of marijuana "is the most obvious factor supporting a finding of probable cause").

Defendant argues that the Government cannot now rely on the automobile exception since the officers believed, at the time of the search of the Jaguar, that they were conducting an inventory search. The Supreme Court has explained, however, that "'the fact that an officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's actions does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action.' ... Subjective intentions play no role in ordinary, probable cause Fourth Amendment analysis." Whren v. United States, 517 U.S. 806, 813 (1996) (quoting Scott v. United States, 436 U.S. 128, 138 (1978)); see also United States v. Ochs, 595 F.2d 1247 (2d Cir. 1979) (upholding a search of a briefcase found in automobile based on probable cause and explaining that it was "of no importance that the police may have thought their only power was to make an inventory; the test is what could lawfully be done, not what the policemen thought the source of their power to be.").

In sum, the officers had probable cause to believe the Jaguar contained marijuana due to the odor of marijuana they detected and therefore properly searched the Jaguar pursuant to the automobile exception.

### d. The Inventory Search Exception

Another exception to the warrant requirement allows officers to conduct an "inventory search" of a vehicle U.S. v. Johnson, 492 Fed.Appx. 437, 440 (4th Cir. 2012). "For the inventory exception to apply, the search must have 'be[en] conducted according to standardized criteria,' such as a uniform police department policy, and performed in good faith." United States v. Matthews, 591 F.3d 230, 235 (4th Cir. 2009) (quoting Colorado v. Bertine, 479 U.S. 367, 374 n. 6 (1987)) (alterations in Matthews); see also United States v. Wilbourne, No. 22-4452, 2023 WL 7319448 (4th Cir. Nov. 7, 2023) (unpubl.) ("Such a policy need not be in writing, nor must the government 'elicit step-by-step testimony concerning such a policy to meet its burden.' Instead, there must simply be sufficient evidence to show that law enforcement had a standard inventory procedure 'and would have inevitably discovered the challenged evidence by conducting an inventory search according to routine and standard ... procedures.'") (internal citations omitted).

"Police officers frequently perform inventory searches when they impound vehicles or detain suspects." Matthews, 591 F.3d at 235. "Such searches 'serve to protect an owner's property while it is in the custody of the

police, to insure against claims of lost, stolen, or vandalized property, and to guard the police from danger.'" Id. (quoting Colorado v. Bertine, 479 U.S. 367, 372 (1987)); see also Whren, 517 U.S. at 811 n. 1 (1996) ("An inventory search is the search of property lawfully seized and detained, in order to ensure that it is harmless, to secure valuable items (such as might be kept in a towed car), and to protect against false claims of loss or damage.").

North Carolina law provides that "[a] motor vehicle is subject to seizure if it is driven by a person who is charged with the offense of felony speeding to elude arrest pursuant to G.S. 20-141.5(b) or (b1)." N.C.G.S. §20-28.3(a1).

In addition, the APD Policy Manual provides that officers may tow vehicles from private property, including "vehicles used in the commission of a crime." Government's Exhibit 33. That policy further provides that when a vehicle is towed, "[o]fficers will conduct an inventory of the vehicle's contents and complete a Vehicle Tow & Inventory Form. The inventory will include all items of removable property with value that could be easily stolen." Id.

Here, however, items of value were left in the Jaguar. Specifically, a makeup kit and curling iron, along with some amount of cash, was left on the dashboard, and a backpack containing a laptop was left in the trunk. Further, the Property and Evidence Voucher completed after the search of the Jaguar only included items of evidentiary value. See Defendant's Exhibit 26.

34

Under these circumstances, the Government has not established that a valid inventory search of the Jaguar occurred. See United States v. Johnson, TDC-16-135, 2017 WL 2256599, at *10 (D. Md. May 22, 2017) (concluding that the search of a vehicle was not a valid inventory search because of "indicia that the search was aimed at gathering evidence," including that the officer searched the car before issuing a citation, began the search without explaining the search was for the "sole purpose" of documenting its contents, was not prepared to document the contents of the vehicle, and only documented the incriminating items found in the car).

## B. The Searches Based on Warrants

### 1. Rocking Porch Road

"When reviewing the probable cause supporting a warrant, a reviewing court must consider only the information presented to the magistrate who issued the warrant." United States v. Wilhelm, 80 F.3d 116, 118 (4th Cir. 1996); see also United States v. Lyles, 910 F.3d 787, 791 (4th Cir. 2018) ("Since a state magistrate judge issued the challenged warrant, we ask whether the magistrate judge had a 'substantial basis' for finding probable cause.").

"Probable cause requires only 'a fair probability,' and not a prima facie showing, that 'contraband or evidence of a crime will be found in a particular place.' Probable cause is therefore 'not a high bar.'" United States v. Bosyk, 933 F.3d 319, 325 (4th Cir. 2019) (quoting Illinois v. Gates, 462 U.S. 213, 238 (1983)

and <u>District of Columbia v. Wesby</u>, 583 U.S. 48, 57 (2018)) (internal citations omitted). "An assessment of the presence of probable cause must be based on the totality of the relevant circumstances, rather than on the technical or rigid demands of a formulaic legal test." <u>United States v. Glass</u>, No. 5:21-CR-00060-KDB-DSC, 2023 WL 2844365, at *7 (W.D.N.C. Apr. 7, 2023). Consequently, "'great deference' is given to the magistrate's assessment of the facts presented to him.'" <u>United States v. Montieth</u>, 662 F.3d 660, 664 (4th Cir. 2011) (quoting <u>United States v. Blackwood</u>, 913 F.2d 139, 142 (4th Cir. 1990) (internal citation omitted)).

Here, Defendant argues that Sergeant Flanders failed to advise the magistrate who issued the warrant that the search of the Jeep was improper, that the search of the Jaguar was not an inventory search, and that the search of the Jaguar occurred at a private residence outside the jurisdiction of the APD. Defendant contends that when the illegally obtained evidence from the search of the Bag and Jaguar is excluded, the search warrant for Rocking Porch Road was not supported by probable cause.

As discussed above, though, the undersigned finds that the searches of the Bag and the Jaguar were proper and, therefore, it was appropriate for Sergeant Flanders to include this information in the application. Further, based on this information and the other details included in the application,

there was probable cause to support the issuance of the Rocking Porch Road warrant.

## 2. The Gray Phone

Finally, Defendant argues that the 16-day delay between the seizure of the Gray Phone and the issuance of the Cell Phone Warrant was constitutionally unreasonable.

The Fourth Circuit has explained that to determine if an extended seizure violates the Fourth Amendment, a court must "balance the government's interest in the seizure against the individual's possessory interest in the object seized." United States v. Pratt, 915 F.3d 266, 273 (4th Cir. 2019) (finding that a 31-day delay between seizure of defendant's phone and obtaining a search warrant violated the Fourth Amendment where defendant had an undiminished interest in the phone and the government had "no persuasive justification for the delay" and instead the agents "failed to exercise diligence by spending a whole month debating where to get a warrant.").

Here, the Government has not explained the delay between the seizure of the Gray Phone and the issuance of the Cell Phone Warrant.

However, Defendant was detained the entire time. Therefore, the delay between the seizure of the Gray Phone and the issuance of the Cell Phone warrant was not unreasonable and does not require the suppression of

evidence obtained from the Gray Phone. See United States v. Horsley, No. 6:19-cr-00013, 2022 WL 827254, at *1-2 (W.D. Va. Mar. 18, 2022) ("There is no dispute that Horsley has not been entitled to any possession of the phones since he has been in custody .... That fact further significantly diminishes any possessory interest Horsley may have had in the phones."); United States v. Skinner, No. 3:19cr19, 2021 WL 1725543, at *25 (E.D. Va. April 29, 2021) ("Skinner had a diminished possessory interest in the cell phones because he was detained and hospitalized following his arrest, the Cell Phones Warrant issued while he was in the hospital, and he remains in custody."); United States v. Dorsey, No. RDB-18-0347, 2019 WL 3804113, at *4 (D. Md. Aug. 13, 2019) ("On the other hand, an individual who is incarcerated, and therefore has no access to a seized item, has a significantly diminished possessory interest in that item.") (citing United States v. Sullivan, 797 F.3d 623, 633-34 (9th Cir. 2015)); see also United States v. Musquiz, No. 4:18CR3116, 2019 WL 3084944, at *6 (D. Neb. June 27, 2019) ("Under the facts presented, Musquiz' possessory interest in the phone was essentially negated by his incarceration. Balancing Musquiz' interest with the government's interest in securing and obtaining evidence of criminal activity, I find the 29-day delay in seeking a warrant to search the digital data on Musquiz' phone was not unreasonable."), report and recommendation adopted, 2019 WL 3082498 (D. Neb. July 15, 2019); United States v. Bradley, No. 18-cr-30037, 2019 WL 4891699, at *7 (C.D. Ill. July 17,

38

2019), report and recommendation adopted, 2019 WL 4039618 (C.D. Ill. Aug. 27, 2019) ("Bradley could not personally possess or use the Subject Phone once he was arrested and detained on December 22, 2016. As a result, his possessory interest in custody was minimal.").

## IV.  Recommendation

Based on the foregoing, the undersigned respectfully **RECOMMENDS** that Defendant's Motion to Suppress (Doc. 23) be **DENIED**.

Signed: July 2, 2024

W. Carleton Metcalf
United States Magistrate Judge

39

## Time for Objections

The parties are hereby advised that, pursuant to Title 28, United States Code, Section 636(b)(1)(B), written objections to the findings of fact, conclusions of law, and recommendation contained herein must be filed within **fourteen (14)** days of service of same. **Responses to the objections must be filed within fourteen (14) days of service of the objections.** Failure to file objections to this Memorandum and Recommendation with the presiding District Judge will preclude the parties from raising such objections on appeal. See Thomas v. Arn, 474 U.S. 140 (1985).